**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-271 (EGS)** |
| **v.** | : | |
| | : | |
| **[1] DAWN LEE BANCROFT,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Dawn Lee Bancroft to sixty days imprisonment to be followed by three years' probation, sixty hours of community service, and $500 in restitution.

### I.   INTRODUCTION

The defendant, Dawn Lee Bancroft, is a small business owner from Doylestown, Pennsylvania who participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than 2.7 million dollars in losses.[1]

On September 28, 2021, Dawn Lee Bancroft pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. ECF Minute Entry from September 28, 2021. As explained herein, a split sentence of incarceration and

---

[1] As of April 5, 2022, the approximate losses suffered because of the siege at the United States Capitol was $2,734,783.15. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

probation is appropriate in this case because (1) Bancroft and her co-defendant twice unlawfully entered into and remained inside of the Capitol via the Senate Wing Door breach point, an entrance that consists of one doorway flanked by two broken-out windows; (2) Bancroft's first breach occurred at 2:49 PM—just two minutes after the second breach of the Senate Wing Door (2:47 PM) and was via climbing through a broken-out window to the north of the door; (3) although Bancroft left the Capitol through the same window after only fifteen seconds, she made her way to the broken-out window just south of the door and breached again just one minute later; (4) during her second breach, Bancroft remained inside the Capitol for approximately one minute and twenty seconds, and appears to film a video while inside; (5) Bancroft admits that she deleted both the video she filmed inside—which was never recovered—and the selfie-style video (5) after leaving the Capitol building, and while attempting to leave the congested Capitol grounds, Bancroft filmed a selfie-style video of herself (GOV'T EXHIBIT 3) in which she stated:

> Diana and I are on our way out but look at the way out. It's crazy. [laughs] This is the part I don't like because you can't breathe, you can't see, and if someone comes and was to drop a bomb, we're dead, basically. I know, right?
>
> But we broke into the Capitol. We got inside. We did our part. **We were looking for Nancy to shoot her in the frickin' brain. But we didn't find her.**
>
> But all is good.

Emphasis added.

These aggravating factors and the totality of Bancroft's actions place her in the range of defendants for whom the government has recommended incarceration and for whom courts of this District have imposed sentences of incarceration. Specifically, the government does so here, especially considering the video Bancroft recorded. In that video Bancroft states that she "did [her] part" when she "broke into the Capitol," "got inside," and was "looking for Nancy to shoot her in the frickin' brain."

The government asks this Court to consider the reality that this defendant's conduct on January 6 took was part of a large and violent riot that desired to disrupt and succeeded in disrupting—albeit temporarily—Congress' certification of the Electoral College's vote. The rioters achieved their goal of breaching the Capitol in numerous locations—twice at the Senate Wing Door—and disrupting the certification proceedings due to the sheer number of rioters. While the exact number of rioters to attack the Capitol and breach its doors is not known at this time, the number was sufficient to overwhelm law enforcement and sully the nation's reputation for a peacefully transitioning power from one administration to the next.

What Bancroft did on January 6, 2021, from her dual entry to her violent rhetoric renders a split sentence of sixty days incarceration split with three years' probation sufficient but not greater than necessary to achieve the purposes set forth in 18 U.S.C. § 3553(a). The facts specific to Bancroft also show this Court why a sentence of probation only or a sentence of home detention is insufficient.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

### A.   The January 6, 2021, Attack on the Capitol

For a general summary of the attack on the Capitol, the government relies on the paragraphs 1-7 of the previously filed Statement of Offense. ECF No. 33. As this Court knows, a riot cannot occur without rioters, and each rioter's actions—from the most mundane to the most violent—contributed to the violence and destruction of that day in both direct and indirect ways.

### B.   Dawn Lee Bancroft's Role in the January 6, 2021, Capitol Siege

On January 6, 2021, Dawn Lee Bancroft and co-defendant Diana Santos-Smith traveled to Washington, D.C., from her home in Doylestown, Pennsylvania, to protest Congress' certification of the Electoral College. At some point in the early afternoon, walked with many other rioters to

the Lower West Plaza.[2] Below are screen shots from United States Capitol Police (USCP) video surveillance of the West Front of the Capitol Building from approximately 2:39 PM[3] to approximately 2:48 PM, when Bancroft was likely in the Northwest Plaza of the Capitol:



*IMAGE 1*—*A screenshot from USCP surveillance showing the Inaugural Stage, the Upper West Plaza, and the Lower West Plaza at approximately 2:39 PM on January 6, 2021.*

---

[2] The government encourages the Court to use GOV'T EXHIBIT 2, a map created by @ne0ndistraction and @sansastark525 and publicly available at https://jan6attack.com/maps.htm, for bearings as the government references various locations where Bancroft is known to have traveled.

[3] Times depicted in the screenshots are in Coordinated Universal Time, or the basis for civil time. In January, UTC is seven hours ahead of Eastern Time, meaning that a UTC time of 19:00 is equivalent to an ET time of 14:00—or 2:00 PM.



**IMAGE 2**—*A screenshot from USCP surveillance showing the Inaugural Stage, the Lower West Plaza, and the West Lawn at approximately 2:45 PM on January 6, 2021.*



**IMAGE 3**—*A screenshot from USCP surveillance showing the NW Lawn and the NW Plaza at approximately 2:47 PM on January 6, 2021.*



*IMAGE 4*—*A screenshot from USCP surveillance showing the NW Plaza at approximately 2:48 PM on January 6, 2021.*

**[THIS SPACE INTENTIONALLY LEFT BLANK]**

Below are screenshots from USCP surveillance video of the breach of the Senate Wing Door, which began at approximately 2:13 p.m. on January 6.





*IMAGE 5 and IMAGE 6—Screenshots from USCP surveillance showing the Senate Wing Door when the first breach was contained at approximately 2:27 PM and when the second breach occurred at approximately 2:48 PM on January 6, 2021.*

Bancroft is first captured on USCP surveillance video entering through the broken-out window just north of the Senate Wing Door. She is wearing a red-and-white beanie with the words MAKE AMERICA GREAT AGAIN and is wearing a blue ALL ABOARD THE TRUMP TRAIN flag as a cape. Bancroft quickly turned around and exits through the same window.





**IMAGE 7 and IMAGE 8**—*Screenshots from USCP surveillance showing Dawn Bancroft entering and exiting the Capitol for the first time through a broken-out window at approximately 2:49 PM and 2:50 PM on January 6, 2021.*

Bancroft's second entrance into the Capitol came just a minute or so later when she made her way to the broken-out window to the south of the Senate Wing Door. Once inside, Bancroft appeared to record a selfie-style video. Soon after, and never having gone more than a few feet from the point of entry, she departed the Capitol.





***IMAGE 9 and IMAGE 10***—*Screenshots from USCP surveillance showing Dawn Bancroft entering the Capitol for the second time through a broken-out window at approximately 2:51 PM and recording a selfie-style video at approximately 2:52 PM on January 6, 2021.*

After leaving the Capitol, Bancroft appeared to remain in the NW Plaza for approximately twenty more minutes. She joined in a chant of "U-S-A! U-S-A!" and then walked away from the Capitol, stopping to thank various officers from the Metropolitan Police Department for their service.





*IMAGE 11 and IMAGE 12—Screenshots from MPD body-worn cameras showing Dawn Bancroft joining in a chant with other rioters on the NW Plaza at 3:07 PM and then walking away from the Capitol at 3:11 PM.*

It is while she was attempting to leave Capitol grounds that Bancroft recorded the video described above.



***IMAGE 13****—A screenshot from the selfie-style video that Bancroft recorded while attempting to leave Capitol grounds.*

On January 12, 2021, the FBI received the aforementioned video from the Upper Dublin Police Department, who themselves had received it as part of an anonymous tip. On January 19, 2021, FBI agents interviewed Bancroft at her home in Doylestown, Pennsylvania. During the non-custodial interview, Bancroft was forthcoming with agents and admitted her conduct at the Capitol on January 6, including the recording of the video and subsequently deleting it. Bancroft claimed she got caught up in the hype of the events of January 6. Bancroft further explained that she felt angry about what she perceived as Congress's hypocrisy, lying, and stealing. Bancroft expressed remorse for her actions and for entering the Capitol.

### C.    The Charges and Plea Agreement

On January 28, 2021, Bancroft was charged by complaint with violating 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), 40 U.S.C. § 5104(e)(2)(D), and 40 U.S.C. § 5104(e)(2)(G). On January 29, 2021, the FBI arrested Bancroft in Fort Washington, Pennsylvania. On April 1,

2021, Bancroft was charged by four-count Information with 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), 40 U.S.C. § 5104(e)(2)(D), and 40 U.S.C. § 5104(e)(2)(G). On September 28, 2021, Bancroft plead guilty to Count Four of the Information, charging her with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. By plea agreement, Bancroft agreed to pay $500 in restitution to the Department of the Treasury.

### D.    Statutory Penalties

The defendant now faces a sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000. The defendant must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

## III.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this misdemeanor case, 18 U.S.C. § 3553(a) guides the sentencing considerations and identifies the factors a court must consider in formulating the defendant's sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of a split sentence of sixty days imprisonment split with three years' probation, sixty hours of community service, and $500 in restitution.

A.      The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms and was the one of the only times in our history when the Capitol—the seat of our representative democracy—was occupied by hostile and violent rioters. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, as we now discuss, this Court should note that each person who entered the Capitol on January 6 without authorization did so under extreme circumstances. By the time they entered the Capitol, they—at a minimum—crossed through numerous barriers and barricades and heard the shouts and exclamations the mob. Depending on the timing and location of their approach, they also may have observed fighting with law enforcement officials and smelled chemical irritants in the air. No rioter was a "mere tourist" that day.

Additionally, while looking at the defendants' individual conduct, this Court, in determining a fair and just sentence, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated  sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment. Had the defendant personally engaged in violence or destruction, he or she would

be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on the part of the defendant is therefore not a mitigating factor in misdemeanor cases.

Bancroft arrived at the Capitol approaching, as many did, from the West after attending the former President's rally. She arrived at the Capitol at a later time than many others, but in so doing, she would have seen a greater degree of violence and the signs of conflict that had taken place earlier in the day. Many rioters commented on the smell of the chemical irritant lingering in the air. Many others participated in or at a minimum heard the chanting and violent rhetoric rippling throughout the crowd on the West Lawn. Images 1 through 4 above show that at around the time that Bancroft was making her way to the NW Plaza and the Senate Wing Door, thousands of rioters were thronging the pathway that she would have necessarily trod to arrive there. As she admitted to the FBI, she was witness to the energy of that day, and can only seek to explain her behavior as having been caught up in it.

When she finally arrived at and entered the Capitol, it was within a minute of the second—and much more violent—breach of the Senate Wing Door. When Bancroft reached the Capitol, she did not attempt to enter by the door, but rather through a broken-out window. Bancroft, to her credit, concedes that entering the Capitol through a broken-out window is wrong. Even so, she left through the first window as quickly as she entered, only to go to the second broken-out window south of the Senate Wing Door and enter again. She left a short time later. Accordingly, the factor of whether, when, how Bancroft entered the Capitol building weighs against her.

Bancroft encouraged violence. Her exclamation—that she had been looking for Nancy Pelosi to shoot her in the frickin' brain—is among the most graphic statements uttered by any rioter on Capitol grounds that day, including the more cryptic note left by Jacob Chansley in the

Senate chamber ("It's only a matter of time, justice is coming"). The government has no evidence to show that Bancroft entered the Capitol with the intent of finding the House Speaker and shooting her. Be that as it may, just as Bancroft felt herself caught up in the negative energy of the day, her reckless words could have easily led or inspired others to act violently towards members of Congress or police officers.

Bancroft is not known to have encouraged others to engage in damaging the Capitol or other government property.

In terms of her reaction to violence and destruction—this weighs against Bancroft. Once inside the Capitol, she claimed that she turned back because of the crowd. The USCP surveillance bears this out, but it also shows her reentering, then joining in chants and mulling about in the NW Plaza for another twenty minutes or so after exiting. Bancroft may have finally left the Capitol to catch her scheduled 4:00 p.m. train back home, and not because of any kind of negative reaction to the violence and property destruction that she had witnessed. Bancroft stated during her non-custodial interview to the FBI that she and Santos-Smith left when they realized they needed to catch their train.

Bancroft destroyed evidence by deleting both the unrecovered video she filmed inside the Capitol and the offensive selfie-style video she later recorded before leaving Capitol grounds.

Bancroft was in the Capitol for a brief period and was always within a few feet of the Senate Wing Door. Further, outside of the selfie video, the defendant has refrained from making statements in person or on social media that justify or excuse her actions. Bancroft also appears to have cooperated with commands from law enforcement officials while on Capitol grounds, and the government does not have any evidence to demonstrate that Bancroft's remorse or contrition is anything but sincere.

The government believes that its recommended split sentence of sixty days imprisonment split with three years' probation, sixty hours of community service, and $500 in restitution is sufficient but not greater than necessary to accomplish the sentencing goals established by statute.

**B.      The History and Characteristics of the Defendant**

As set forth in the Presentence Investigation Report, Bancroft has no prior criminal history. Bancroft has lived in Bucks County her entire life and has owned her own business since 2009. She has no physical disabilities or mental health concerns and does not appear to suffer from substance abuse.

Bancroft has shown a measure of defiance in complying with Court orders. When asked to complete the Cash Flow or Net Worth Statements requested by Probation, she refused. Bancroft, through counsel, indicated that she would rather pay a fine in this case. ECF No. 42, p. 11.

This weighs in favor of a split sentence of sixty days imprisonment split with three years' probation, sixty hours of community service, and $500 in restitution. Having lived a law-abiding life for over half a century, Bancroft should have recognized the folly of her actions long before she arrived at the Capitol, before she twice breached the Capitol, and certainly before recording a video talking about shooting the House Speaker while in the midst of a riot where such violence by others was possible.

**C.      The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the

democratic process."[4] As with the nature and circumstances of the offense, this factor supports a split sentence of sixty days imprisonment split with three years' probation, sixty hours of community service, and $500 in restitution, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually—should be expected") (statement of Judge Hogan).

### D.   The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

### 1.   General Deterrence

As applied to Bancroft, general deterrence weighs in favor of incarceration, as it does for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. The violence at the Capitol on January 6 was cultivated to and did interfere with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

---

[4] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight. house.gov/files/Wray%20Testimony.pdf

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

2.     *Specific Deterrence*

The government acknowledges that Bancroft has no convictions, arrests, or even traffic tickets, and that she accepted responsibility early by entering into this plea agreement. A sentence of only probation, however, is not justified given Bancroft's violent rhetoric on Capitol grounds directed at a member of Congress. This is especially true given her proximity to violent individuals and presence near the front line of the rioters during the violent second breach of the Senate Wing Door. The government believes that a split sentence of sixty days imprisonment split with three

years' probation, sixty hours of community service, and $500 in restitution satisfies the need for specific deterrence.

### E.       The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this assault on the Capitol, ranging from misdemeanor charges (such as in this case), to charges of assault on law enforcement officers and conspiracy to corruptly interfere with Congress.[5] Certainly each offender must be sentenced based on their individual circumstances, but this Court should always keep the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a term of home detention—or exceedingly rarely, probation only—to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021, *were not* minor crimes. A probationary sentence should not become the default.[6] Indeed, it was this Court that previously stated, "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here,

---

[5] Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants. That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[6] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

because it's not going to be.' And I agree with that. Judge Hogan said something similar.")
(statement of Judge Friedman).

The government and the sentencing courts have already begun to make meaningful
distinctions between offenders. Those who engaged in felonious conduct are generally more
dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment.
Those who trespassed, but engaged in aggravating factors, merit serious consideration of
institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors,
deserve a sentence more in line with minor incarceration or home detention.

Bancroft plead guilty to Count Four of the Information, charging her with parading,
demonstrating, or picketing in a Capitol Building, a violation of 40 U.S.C. § 5104(e)(2)(G). This
offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and
infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply,
U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to
avoid unwarranted sentence disparities among defendants with similar records who have been
found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol
breach on January 6, 2021, many considerations help in understanding the differing
recommendations and sentences. These considerations include those discussed above, including
how a defendant entered the Capitol, how long they remained inside, the nature of any statements
they made (on social media or otherwise), whether they destroyed evidence of his participation in
the breach, etc. And as that discussion illustrates, avoiding unwarranted disparities requires the
courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing
criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See*

*United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of the legislative branch of the federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and the large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

The sentences imposed in previously sentenced cases involving the events of January 6 demonstrate that a probation-only sentence in this case would create a disparity with others. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court government suggests that the Court consider the sentence imposed by Your Honor in *U.S. v. James Bonet*, 21-CR-121 (EGS). There, the defendant entered the Capitol at 3:09 p.m. and boasted about it. He entered Senator Merkley's conference room and while inside, he smoked marijuana. He was sentenced to three months' incarceration, three months' probation, 200 hours' community service, and ordered to pay $500 restitution.

In *U.S. v. Daniel Herendeen*, 21-CR-278-2 (BAH), the defendant also entered through the Senate Wing Door. While inside the Capitol, Herendeen recorded a video in which he stated, referring to members of Congress, "They're in the basement, we need to go to the basement." Similar to Bancroft, Herendeen never went to the basement or otherwise physically directed others to go to the basement of the Capitol. The Chief Judge imposed a sentence of fourteen days intermittent incarceration, two months' home detention, and thirty-six months' probation. Although Herendeen mentioned members of Congress generally, indicated that he believed they were in the basement, and said that the rioters needed to go there, the graphic nature of Bancroft's statement differentiates the two and shows the need for additional jail time in this case.

In *U.S. v. Oliver Sarko*, 21-CR-591 (CKK), the defendant entered through the Senate Wing Door during its second breach, just as Bancroft did. Sarko also recorded videos of himself shouting "Bring out Pelosi!" and "Where are the traitors?" He celebrated his entry into the Capitol after seeing grounded barricades and smelling tear gas. Sarko, like Bancroft, heard the alarms blaring throughout the building, but despite all the visual and audible signs that he and the mob were not authorized to be inside of the Capitol, he entered and remained inside. Sarko received a sentence of thirty days incarceration split with thirty-six months' probation. Sarko, like Bancroft, called out Pelosi by name, but stopped short of explicitly and graphically stating what he wanted to do to her.

In *U.S. v.Willard Jake Peart*, 21-CR-662 (PLF), the defendant entered the Capitol through the Senate Wing Door at approximately the same time as Bancroft. Peart remained inside the Capitol for approximately thirty minutes, and while inside, he shouted, "Where are the Senators?" and specifically called out Senator Mitt Romney. When interviewed by the FBI, Peart stated, "I don't know what would have happened if I had seen Mitt Romney. It's probably a good  thing that I didn't see him, because I would have been, who knows, I was definitely, um ya know, there."

U.S. v. Peart, ECF No. 34, p. 1. There Judge Friedman sentenced the defendant to two months' home detention as a special condition of three years' probation. The tenor of Peart's comments stopped short of Bancroft's graphic and disturbing statement.

The task of balancing sentences of the Capitol riots defendants is difficult, and that difficulty will only increase as the number of guilty pleas grows. At least one thing is clear: Bancroft should *not* receive a sentence of home detention.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## IV.   AS THIS COURT HAS PREVIOUSLY RECOGNIZED, IT HAS AUTHORITY TO IMPOSE THE GOVERNMENT'S RECOMMENDED SPLIT SENTENCE OF A TERM OF INCARCERATION TO BE FOLLOWED BY A TERM OF PROBATION IN THIS CASE.

A sentencing court may impose a "split sentence"—"a period of incarceration followed by period of probation," *Foster v. Wainwright*, 820 F. Supp. 2d 36, 37 n.2 (D.D.C. 2011) (citation omitted)—for a defendant convicted of a federal petty offense. See *See* 18 U.S.C. § 3561(a)(3); *see United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022)

(concluding that " a split sentence is permissible under law and warranted by the circumstances of this case); *United States v. Sarko*, No. 21CR591 (CKK), 2022 WL 1288435, at *1 (D.D.C. Apr. 29, 2022) (explaining why a split sentence is permissible in a petty offense case); *United States v. Caplinger*, No. CR 21-0342 (PLF), 2022 WL 2045373, at *1 (D.D.C. June 7, 2022) ("the Court concludes that a split sentence is permissible for a petty offense and therefore is an option for the Court in Mr. Caplinger's case."); *United States v. Smith*, 21-cr-290 (RBW), ECF 43 (D.D.C. Mar. 15, 2022) (imposing split sentence); *United States v. Meteer*, 21-cr-630 (CJN), ECF 37 (D.D.C. April 22, 2022) (imposing split sentence); *United States v. Entrekin*, 21-cr-686 (FYP), ECF 34 (D.D.C. May 6, 2022) (imposing split sentence); *United States v. Hemphill*, 21-cr-555 (RCL), ECF 42 (D.D.C. May 24, 2022) (imposing split sentence); *United States v. Buhler*, 21-cr-510 (CKK), ECF 39 (D.D.C. June 1, 2022) (imposing split sentence); *United States v. Revlett*, 21-cr-281 (JEB), ECF 46, (D.D.C. July 7, 2022) (imposing split sentence); *United States v. Getsinger*, 21-cr-607 (EGS), ECF Minute Entry (D.D.C. July 12, 2022) (imposing split sentences); *United States v. Blakely*, 21-cr-00356 (EGS), ECF Minute Entry (D.D.C. July 14, 2022); *United States v. Ticas*, 21-cr-00601 (JDB), ECF Minute Entry (D.D.C. July 15, 2022). In addition, for any defendant placed on probation, a sentencing court may impose incarceration for a brief interval as a condition of probation under 18 U.S.C. § 3563(b)(10).

### A. Relevant Background

In 1984, Congress enacted the Sentencing Reform Act, which in substantial part remains the sentencing regime that exists today. *See* Pub. L. No. 98–473, §§211-212, 98 Stat 1837 (1984), *codified at* 18 U.S.C. § 3551 *et seq.*; *see Mistretta v. United States*, 488 U.S. 361, 365-66 (1989) (noting that the Sentencing Reform Act of 1984 wrought "sweeping changes" to federal criminal sentencing). That legislation falls in Chapter 227 of Title 18, which covers "Sentences." Chapter

227, in turn, consists of subchapter A ("General Provisions"), subchapter B ("Probation"), subchapter C ("Fines"), and subchapter D ("Imprisonment).   Two provisions—one from subchapter A and one from subchapter B—are relevant to the question of whether a sentencing court may impose a term of continuous incarceration that exceeds two weeks[7] followed by a term of probation.

First, in subchapter A, 18 U.S.C. § 3551 sets out "[a]uthorized sentences."  Section 3551(a) makes clear that a "defendant who has been found guilty of" any federal offense "shall be sentenced in accordance with the provisions of" Chapter 227 "[e]xcept as otherwise specifically provided."  18 U.S.C. § 3551(a).  Section 3551(b) provides that a federal defendant shall be sentenced to "(1) a term of probation as authorized by subchapter B; (2) a fine as authorized by subchapter C; or (3) a term of imprisonment as authorized by subchapter D."  18 U.S.C. § 3551(b).[8] As a general matter, therefore, "a judge must sentence a federal offender to either a fine, a term of probation, or a term of imprisonment."  *United States v. Kopp*, 922 F.3d 337, 340 (7th Cir. 2019).

Second, 18 U.S.C. § 3561, the first provision in subchapter B, addresses a "[s]entence of probation."  As initially enacted, Section 3561 provided that a federal defendant may be sentenced to a term of probation "unless . . . (1) the offense is a Class A or Class B felony and the defendant is an individual; (2) the offense is an offense for which probation has been expressly precluded; or (3) the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense."  Pub. L. No. 98-473, at § 212; *see United States v. Anderson*, 787 F. Supp. 537, 539 (D.

---

[7] A period of incarceration that does not exceed two weeks followed by a term of probation is also permissible under 18 U.S.C. § 3653(b)(10). *See* Part II *infra*.

[8] Section 3551(b) further provides that a sentencing judge may impose a fine "in addition to any other sentence."  18 U.S.C. § 3551(b).

Md. 1992) (noting that the Sentencing Reform Act did not permit "a period of 'straight' imprisonment . . . at the same time as a sentence of probation").

Congress, however, subsequently amended Section 3561(a)(3).  In 1991, Congress considered adding the following sentence to the end of Section 3561(a)(3): "However, this paragraph does not preclude the imposition of a sentence to a term of probation for a petty offense if the defendant has been sentenced to a term of imprisonment at the same time for another such offense."  H.R. Rep. 102-405, at 167 (1991).  Instead, three years later Congress revised Section 3561(a)(3) by appending the phrase "that is not a petty offense" to the end of the then-existing language.  *See* H.R. Rep. No. 103-711, at 887 (1994) (Conference Report).  In its current form, therefore, Section 3561(a)(3) provides that a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).

### B.  *Analysis*

Before Congress passed the Sentencing Reform Act of 1984, sentencing courts could impose a split sentence on a federal defendant in certain cases.  *See United States v. Cohen*, 617 F.2d 56, 59 (4th Cir. 1980) (noting that a sentencing statute enacted in 1958 had as its "primary purpose . . . to enable a judge to impose a short sentence, not exceeding sixth months, followed by probation on a one count indictment"); *see also United States v. Entrekin*, 675 F.2d 759, 760-61 (5th Cir. 1982) (affirming a split sentence of six months' incarceration followed by three years of probation).  In passing the Sentencing Reform Act, Congress sought generally to abolish the practice of splitting a sentence between imprisonment and probation because "the same result" could be accomplished through a "more direct and logically consistent route," namely the use of supervised release as set out in 18 U.S.C. §§ 3581 and 3583.  S. Rep. No. 225, 1983 WL 25404,

at *89; *accord* United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") § 5B1.1, Background.  But Congress's 1994 amendment to Section 3561(a)(3) reinstated a sentencing court's authority to impose a split sentence for a petty offense.

Under 18 U.S.C. § 3561, a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).  Thus, for any federal offense *other than* a petty offense, Section 3561(a)(3) prohibits "imposition of both probation and straight imprisonment," consistent with the general rule in Section 3551(b).  *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999); *see United States v. Martin*, 363 F.3d 25, 31 (1st Cir. 2004); *United States v. Harris*, 611 F. App'x 480, 481 (9th Cir. 2015); *Anderson*, 787 F. Supp. at 539.

But the statutory text of 18 U.S.C. § 3561(a)(3) goes further by permitting a court to sentence a defendant to a term of probation "unless" that defendant "is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).  Section 3561 "begins with a grant of authority"—permitting a court to impose probation—followed by a limitation in the words following "unless."  *Little*, 2022 WL 768685, at *4.  But that limitation "does not extend" to a defendant sentenced to a petty offense.  *See id.* ("[W]hile a defendant's sentence of a term of imprisonment *may* affect a court's ability to impose probation, the petty-offense clause limits this exception.").

It follows that when a defendant *is* sentenced for a petty offense, that defendant may be sentenced to a period of continuous incarceration and a term of probation.  *See United States v. Posley*, 351 F. App'x 807, 809 (4th Cir. 2009) (per curiam).  In *Posley*, the defendant, convicted of a petty offense, was sentenced to two years of probation with the first six months in prison.  *Id.* at 808.  In affirming that sentence, the Fourth Circuit concluded that Section 3561(a)(3)

"[u]nquestionably" provided statutory authority to sentence the petty-offense defendant to "a term of six months of continuous imprisonment plus probation." *Id.* at 809; *see* Cyclopedia of Federal Procedure, § 50:203, *Capacity of court to impose probationary sentence on defendant in conjunction with other sentence that imposes term of imprisonment* (3d ed. 2021) ("[W]here the defendant is being sentenced for a petty offense, a trial court may properly sentence such individual to a term of continuous imprisonment for a period of time, as well as a sentence of probation.") (citing *Posley*); *see also* Wright and Miller, *Federal Practice and Procedure*, § 547, at n.13 (4th ed. 2021) ("A defendant may be sentenced to probation unless he . . . is sentenced at the same time to imprisonment for an offense *that is not petty*.") (emphasis added).

Nor does the phrase "that is not a petty offense" in Section 3561(a)(3) modify only "different offense." *See Little*, 2022 WL 768685, at *5-*6 (concluding that "same" in Section 3561(a)(3) functions as an adjective that modifies "offense"). Section 3561(a)(3) does not state "the same *offense* or a different offense that is not a petty offense," which would imply that the final modifier—*i.e.*, "that is not a petty offense"—applies only to "different offense." The phrase "that is not a petty offense" is a postpositive modifier best read to apply to the entire, integrated phrase "the same or a different offense." *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 148 (2012). Had Congress sought to apply the phrase "not a petty offense" solely to "different offense," the "typical way in which syntax would suggest no carryover modification" would be some language that "cut[s] off the modifying phrase so its backward reach is limited." *Id.* at 148-49. And while the indefinite article "a" might play that role in other contexts (*e.g.*, "either a pastry or cake with icing" vs. "either a pastry or a cake with icing"), the indefinite article in Section 3561(a)(3) merely reflects the fact that the definite article before "same" could not naturally apply to the undefined "different offense." *See Little*, 2022 WL

768685, at *6 (identifying other statutes and "legal contexts" with the identical phrase that carry the same interpretation).

Permitting a combined sentence of continuous incarceration and probation for petty offenses is sensible because sentencing courts cannot impose supervised release on petty-offense defendants. *See* 18 U.S.C. § 3583(b)(3); *United States v. Jourdain*, 26 F.3d 127, 1994 WL 209914, at *1 (8th Cir. 1994) (unpublished) (plain error to impose a term of supervised release for a petty offense).  When Congress in 1994 amended the language in Section 3561(a), it again provided sentencing courts with "latitude," *see* S. Rep. 98-225, 1983 WL 25404, at *89, to ensure some degree of supervision—through probation—following incarceration.

Section 3551(b)'s general rule that a sentencing court may impose either imprisonment or probation (but not both) does not preclude a sentencing court from imposing a split sentence under Section 3561(a)(3) for a petty offense for two related reasons.

First, the more specific permission for split sentences in petty offense cases in Section 3561(a)(3) prevails over the general prohibition on split sentences in Section 3551(b).  *See Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one.").  As noted above, when Congress enacted the general prohibition on split sentences in Section 3551(b), it had not yet enacted the more specific carveout for split sentences in petty offense cases in Section 3561(a)(3).  That carveout does not "void" the general prohibition on split sentences in Section 3551(b); rather, Section 3551(b)'s general prohibition's "application to cases covered by the specific provision [in Section 3651(a)(3)] is suspended" as to petty offense cases.  Scalia & Garner, *supra*, at 184.  In other words, Section 3551(b)'s prohibition against split sentences "govern[s] all other cases" apart

from a case involving a petty offense.  *Id.*  This interpretation, moreover, "ensures that *all* of Congress's goals set forth in the text are implemented."  *Little*, 2022 WL 768685, at *8.

Second, to the extent Section 3551(b)'s general prohibition against split sentences conflicts with Section 3561(a)(3)'s permission for split sentences in petty offense cases, the latter, later-enacted provision controls.  *See Posadas v. Nat'l Bank of N.Y.*, 296 U.S. 497, 503 (1936) ("Where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one."); Scalia & Garner, *supra*, at 327-329.  Where a conflict exists "between a general provision and a specific one, whichever was enacted later might be thought to prevail."  *Id.* at 185.  "The "specific provision"—here Section 3561(a)(3)—"does not negate the general one entirely, but only in its application to the situation that the specific provision covers."  *Id.*  Section 3551(b)'s general prohibition does not operate against the more specific, later-enacted carveout for split sentences in Section 3561(a)(3).

An interpretation of Sections 3551(b) and 3561(a) that a sentencing court "must choose between probation and imprisonment when imposing a sentence for a petty offense," *United States v. Spencer*, No. 21-cr-147 (CKK), Doc. 70, at 5 (Jan. 19, 2022), fails to accord the phrase "that is not a petty offense" in Section 3561(a)(3) any meaning.  When Congress in 1994 amended Section 3561(a)(3) to include that phrase, it specifically permitted a sentencing court in a petty offense case to deviate from the otherwise applicable general prohibition on combining continuous incarceration and probation in a single sentence.  Ignoring that amended language would improperly fail to "give effect to every clause and word" of Section 3561(a)(3).  *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013).

Congress's unenacted language from 1991 does not suggest that a split sentence is available only where a defendant is sentenced at the same time for two different petty offenses or for two

offenses, at least one of which is a petty offense.  For one thing, the Supreme Court has regularly rejected arguments based on unenacted legislation given the difficulty of determining whether a prior bill prompted objections because it went too far or not far enough.  *See Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989) ("We do not attach decisive significance to the unexplained disappearance of one word from an unenacted bill because 'mute intermediate legislative maneuvers' are not reliable indicators of congressional intent.") (citation omitted).  Moreover, under that view, every offense other than a petty offense could include some period of incarceration and some period of supervision (whether that supervision is supervised release or probation).  Yet so long as a defendant was convicted of two petty offenses, that defendant could be sentenced to incarceration and supervision (in the form of probation).  No sensible penal policy supports that interpretation.

It follows that a sentencing court may impose a combined sentence of incarceration and probation where, as here, the defendant is convicted of a petty offense.  Dawn Lee Bancroft pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building, which is a "petty offense" that carries a maximum penalty that does not exceed six months in prison and a $5,000 fine.  *See* 18 U.S.C. § 19; *see United States v. Soderna*, 82 F.3d 1370, 1381 n.2 (7th Cir. 1996) (Kanne, J., concurring) (citations omitted) (noting that a petty offender may face a sentence of up to five years in probation).

### C. A sentence of probation may include incarceration as a condition of probation, though logistical and practical reasons may militate against such a sentence during an ongoing pandemic.

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation."  18 U.S.C. § 3563. Among the discretionary conditions of probation a sentencing court may impose is a requirement that a defendant

> remain in the custody of the Bureau of Prisons during nights, weekends or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release.

18 U.S.C. § 3563(b)(10).  Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration as a condition of probation in one of two ways.  S. Rep. No. 225, 1983 WL 25404, at *98.  First, a court can direct that a defendant be confined in "split intervals" over weekends or at night.  *Id.*  Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two."  *Id.*[9]

A sentencing court may impose one or more intervals of imprisonment up to a year (or the statutory maximum) as a condition of probation, so long as the imprisonment occurs during "nights, weekends or other intervals of time."  18 U.S.C. § 3653(b)(10).  Although the statute does not define an "interval of time," limited case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time.  *United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above and reversing magistrate's sentence that included 30-day period of confinement as a condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also Anderson*, 787 F. Supp. at 538 (continuous 60-day incarceration not appropriate as a condition of probation); *Forbes*, 172 F.3d at 676 ("[S]ix months is not the intermittent incarceration that this statute permits.").  Accordingly, a sentence of

---

[9] Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation was "not intended to carry forward the split sentence provided in Section 3561, by which the judge imposes a sentence of a few months in prison followed by probation."  S. Rep. No. 225, 1983 WL 25404, at *98.

up to two weeks' imprisonment served in one continuous term followed by a period of probation is permissible under Section 3563(b)(10).[10]

A sentencing court may also impose "intermittent" confinement as a condition of probation to be served in multiple intervals during a defendant's first year on probation. 18 U.S.C. § 3563(b)(10); *see Anderson*, 787 F. Supp. at 539. Notwithstanding a sentencing court's legal authority to impose intermittent confinement in this manner, the government has refrained from requesting such a sentence in Capitol breach cases given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic. Those concerns would diminish if conditions improve or if a given facility is able to accommodate multiple entries and exits without unnecessary risk of exposure.

---

[10] Section 3563(b)(10)'s use of the plural to refer to "nights, weekends, or intervals of time" does not imply that a defendant must serve multiple stints in prison. Just as "words importing the singular include and apply to several persons, parties, or things," "words importing the plural include the singular." 1 U.S.C. § 1; *see* Scalia & Garner, *supra*, at 129-31.

## V.   CONCLUSION

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Dawn Lee Bancroft to sixty days imprisonment to be followed by three years' probation, sixty hours of community service, and $500 in restitution. This sentence will serve to protect the community, promote respect for the law, and deter future crime by imposing restrictions on her liberty because of her behavior, while recognizing her early acceptance of responsibility.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:

SEAN P. MURPHY
Assistant United States Attorney
D.C. Bar No. 1187821
Torre Chardon, Suite 1201
350 Carlos Chardon Ave.
San Juan, PR 00918
787-766-5656
sean.murphy@usdoj.gov