IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| V. | : | CRIMINAL NO. |
| | : | |
| DAWN BANCROFT | : | 21-271 |

## SENTENCING MEMORANDUM

Defendant Dawn Bancroft, by and through her attorney, Carina Laguzzi, hereby submits this Memorandum in mitigation of sentence in the above-referenced matter. Based on the factors and reasons addressed below, Ms. Bancroft respectfully requests a sentence which would prove to be sufficient, but not greater than necessary, to comply with the statutory directives set forth in 18 U.S.C. §3553(a)(2). The sentencing hearing is currently scheduled for <u>May 26, 2022 at 1PM</u>.

**I.       INTRODUCTION**

Dawn Bancroft stands before the Court with sincere and great remorse for her actions in this case, asking for mercy. It is requested this Honorable Court impose a sentence which allows Ms. Bancroft to continue her path she led before this case- as a productive and law abiding member of society with legitimate employment, a positive influence to her children, as well as respected member of her community.

## II.        BACKGROUND OF THE CASE

### A.  Facts of the Offense

The facts of the offense have been accurately recounted in the Statement of Offense which were then adopted into the record on September 28, 2021, as well as the Facts section of the presentence investigation report.  Thus, there is no need for further recitation here.

### B.  Procedural History

Ms. Bancroft was processed by Criminal Information on January 29, 2021.  No formal arrest was necessary as Ms. Bancroft made arrangements via counsel to turn herself into the Federal Bureau of Investigation ("FBI") Office in Philadelphia, Pennsylvania.   On September 28, 2021, Mr. Bancroft appeared before this Honorable Court via video teleconference pursuant to the Coronavirus Aid, Relief, and Economic Security Act ("CARES ACT")[1] (due to the ongoing COVID-19 pandemic), and entered a plea of guilty to Count Four of the Information.   Count Four was for a misdemeanor charge of 40 U.S.C. § 5104(e)(2)(G)- a Class B misdemeanor (which does not fall under the sentencing guideline range).  The case is now scheduled for sentencing.

---

[1] Passed by the 116th U.S. Congress and signed into law on March 27, 2020, in response to the economic fallout of the COVID-19 pandemic in the United States.

**III.**          **SENTENCING FACTORS AND CONSIDERATIONS**

Dawn Bancroft pled guilty to one count of the Information.  Ms. Bancroft has admitted her guilt at her change of plea hearing and, therefore, is credited with acceptance of responsibility.  In addition, she pled guilty in a timely manner having decided to accept the government's plea less than one month after the government extended it.   Sentencing courts must give "meaningful consideration to the § 3553(a) factors… A role statement of the § 3553(a) factors should not suffice if, at sentencing, either the defendant or the prosecution properly raises 'a ground of recognized legal merit (provided it has a factual basis) and the Court fails to address it."  See United States v. Cooper, 437 F.3d 324, 329 (3d Cir. 2006)(Citations omitted).  See also United States v. Schweitzer, 454 F.3d 197, 205-06 (3d Cir. 2006)(directing district courts to explain all guideline determinations and final sentences, stating, "[t]here is simply no substitute for on-the-record discussion and deliberation.   It ensures that the parties are fully informed of their rights and obligations and that the appellate court will be able to assess the merits of the final judgment,"); United States v. King, 454 F.3d 187, 196-97 (3d Cir. 2006)(District courts "should observe the requirement to state adequate reasons for a sentence on the record so that this court can engage in meaningful appellate review.").

Although this case does not fall under the sentencing guidelines, the same traditional goals of sentencing apply here.  The Court must also consider the factors enumerated under § 3553(a).  The primary directive in § 3553(a) is for

sentencing courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purpose set forth in paragraph 2."  Section 3553(a)(2) states that such purposes are:

> (A)   To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)   To afford adequate deterrence to criminal conduct;
>
> (C)   To protect the public from further crimes of the defendant; and
>
> (D)   To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

In determining a sufficient sentence, § 3553(a) further directs sentencing courts to consider the following factors:

> (1)   "the nature and circumstances of the offense and the history and characteristics of the defendants,"  See 18 U.S.C. § 3553(a)(1);
>
> (2)    "the kinds of sentences available," see 18 U.SC. § 3553(a)(3);
>
> (3)   "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." See 18 U.S.C. § 3553(a)(6); and

(4)     "the need to provide restitution to any victims of the offense."

See 18 U.S.C. § 3553(a)(7).

In sum, in every case, a sentencing court must now consider all of the § 3553(a) factors to determine a sentence that is sufficient, but not greater than necessary, to meet the goals of sentencing.

## A.     Need for Punishment

Even minor criminal offenses require a culpable defendant to be punished.  In this case, defense submits to the Court Ms. Bancroft has already been punished in several real and permanent ways.  First, Ms. Bancroft is now subject to a criminal record for the rest of her life.  The consequences of her actions will follow her forever.  When Googling her name, she will always be tied to her actions on January 6th.  Second, Ms. Bancroft has received, and continues to receive, threats on her personal cellular phone.[2]  See Exhibit A.  Third, she has also received nasty, and sometimes threatening letters, at work from across the country.  See Exhibit B[3].  Fourth, her business, a gymnasium, which had already been struggling financially after the COVID-19 pandemic, lost its CrossFit designation after her arrest was made public.  This translated into half of her remaining clients also leaving, leaving her business in an almost failing state.  The conviction, public humiliation, and collateral consequences of her arrest, are in

---

[2] Ms. Bancroft's cellular phone is tied to her business and her telephone phone number had been public until this incident on the internet.

[3] The first two letters were sent from Saint Louis, Missouri (though the return address was marked "Centreville, Illinois"; the postcard was from Sacramento, California; and photograph letter was postmarked Orlando, Florida.  These only constitute a sampling of the many hate letters and abusive mail Ms. Bancroft was received.

and of themselves punishment enough. Defense respectfully submits neither incarceration, nor a lengthy probation sentence is necessary in this case. If deemed necessary by this Court, Ms. Bancroft is prepared to pay a fine in this case.[4]

### B.    Deterrence

The deterrence issue is one of both specific deterrence for this defendant as well as general deterrence to the public. There is no doubt many consequences the Ms. Bancroft has faced already ensures she will not recidivate. These include death threats after her case was made public. Her gymnasium, Bucks County Elite Fitness, lost its CrossFit designation the day after her arrest was made public. Due to her conviction, she will never again be able to regain use of this designation in spite of her certification and hours of training to receive it in the first place. She had to deactivate all social media accounts due to the damaging comments that were being posted, as well as direct death threats against her.

### C.    Rehabilitation

Perhaps the most important consideration in this section the Court can give is the fact that in Ms. Bancroft's entire life, this was one abhorrent act. A "knee jerk" decision made in a moment following others on the misguided information that the presidential election had been stolen. This perpetuated by the

---

[4] However, the maximum fine in this case, as requested by United States Probation, is not appropriate as written below.

speech given by Donald Trump that day.  For further details on Ms. Bancroft's life, see mitigation report attached as Exhibit "C".

Ms. Bancroft is currently fifty-nine (59) years old.  The risk of recidivism drops dramatically for defendant over 40 years of age, lessening the need to protect the public from further crimes of the defendant pursuant to 18 U.S.C. § 3553(a)(2)(C).  (See United States Sentencing Commission, Measuring Recidivism:  The Criminal History Computation of the Federal Sentencing Guidelines at 12;  www.usscgov/publicat/recidivism-general.pdf.)  This is especially true of a defendant who has never before had any contacts with the criminal justice system.

In addition, the Court can see already assess her behavior under supervision, as she has been on pre-trial supervised release since her initial appearance and detention hearing in the Eastern District of Pennsylvania on January 29, 2021.  For over a year, Ms. Bancroft has been monitored and has had no instances or issues with the conditions of her bond.

### D.      Protecting Public[5]

Ms. Bancroft did not participate in any violent act during the January 6th event, nor did she witness any violence.  Also, she did not cheer on, nor did she incite any violence.  (See below for further discussion on selfie video and remarks of made therein.)  She did not participate in any destruction of property.  She is a home and business owner with strong ties to her community.  She is a mother of three adult children and grandmother to two minor children.

After having contracted the COVID-19 virus earlier in the pandemic, she has donated plasma several times in an attempt to aid the medical and scientific community.  Her donation has yielded a total of 8 units.  The donations include: May 7, 2020 in Willow Grove, PA; June 21, 2020 in Willow Grove, PA; July 26, 2020 in Northeast Philadelphia; August 23, 2020 in Northeast Philadelphia; September 27, 2020 in Philadelphia; October 25, 2020 in Philadelphia; November 22, 2020 in Philadelphia; May 13, 2021 in Philadelphia; December 2, 2021 in Horsham, PA; and December 31, 2021 in Horsham.

---

[5] The January 6th Committee issued new subpoenas as late as September 30, 2021, into their investigation into the Capitol building insurrection as discussed by Congresswoman Zoe Lofgren (Democrat from California who serves on the Committee) on MSNBC.  www.msn.com/en-us/news/politics/trump-s-not-innocent-january-6th-committee-issues-new-subpoenas/vi-AAOYdUD?ocid=msedgdhp&pc=U531.       It remains an active investigation and are directed at the people who sought the permits and funded it.  Id. Some people from the Trump campaign, such as Katrina Peterson, were named in those subpoenas.  Id. The purpose of the investigation was to find out the communication form the organizers and the White House and where the funding came from. Id.  Second impeachment also was led from communication from Ms. Peterson and Donald Trump.  Id.  The investigation is to find out whether the White House knew ahead of time that there was a plan to breach the Capitol building.  Id.  The purpose of the committee is to find this out. Id.

### E.    Avoiding Inequitable Disparities in Sentences[6]

Although some defendants charged with their actions during the Capitol insurrection have received sentences much higher than what the defense is requesting here, it is important to note differences with those defendants.

The government has taken the position on many cases "the need to deter others is especially strong in cases involving domestic terrorism."  See United States v. Paul Allard Hodgkins, (where the government is seeking an 18-month prison term on one count of obstructing an official proceeding.  See Criminal Docket No. 1:21-cr-188.  In that case, AUSA Mona Sedky argued to Judge Randolph D. Moss that despite many of the individuals involved in this case, their views make them "unique among criminal in the likelihood of recidivism."  However, this statement is not based on any actual statistics or study and therefore, is not a fair or accurate statement to be considered here with regards to Ms. Bancroft.  As noted above, Ms. Bancroft's reaction to her arrest and conviction is vastly different from other including the case of United States v. Jenna Ryan, a 50 year old woman from Texas who after receiving a 60 day incarceration period ranted on Twitter about her sentence.  See Criminal Docket

---

[6] While most defendants indicted as a result of their action in January 6th were allowed to travel freely throughout the United States.  Ms. Bancroft was initially not allowed to take a pre-paid ski vacation to Wyoming days after she turned herself in after being initially arraigned in the Eastern District of Pennsylvania.

No. 1:21-cr-050.   See also www.dailymail.co.uk/news/acrticle-10168785/Texas-realtor-took-private-jet-Capitol-riot-calls-60-day-jail-sentence-travesty.html.[7]

## F.      Characteristics and Overall Nature of the Defendant

Pursuant to 18 U.S.C. § 3553(a)(1), the history and characteristics of the defendant are an imperative consideration of sentencing.  See Exhibit "C." Ms. Bancroft has never before been involved in any criminal actions in 59 years. Her son, Chach, is a military man.  She has upmost respect for law enforcement. Id.  She has shown remorse for her actions by pleading guilty.  During her change of plea hearing, after being asked again by the Court if she wishes to enter a plea of guilty, she stated, "I am going to accept consequences for my actions.  It is what I have taught my children."  Her voice broke due these statements due to her remorse.   For a detailed recitation of Ms. Bancroft's life and contribution to society by the way of volunteering and aiding those in need should be a strong consideration during sentencing.  Id.

---

[7] The Honorable Christopher Cooper found Ms. Ryan was a "cheerleader" that day stating, "…you cheered it on." www.huffpost.com/entry/jenna-ryan-setnence-capiotl-attack-trump_n_6182bb4fe4b0c8666bd6f913. According to the FBI, she took a selfie video before going to the Capitol stating, "We're gonna go down and storm the Capitol…. That's why we came, and so that's what we are going to do. www.rollingstone.com/politics/politics-news/jenna-ryan-jan-6-defendant-prison-1253379/.        This is different from Ms. Bancroft's posture whose intent in going to D.C. was only to protest and hear former President Trump speak.  The government's posture was that Ryan lacked remorse, which is not the case here.  Id. Prosecutors argued, "A defendant who believes she is immune from strict punishment because of her race and physical appearance may reoffend because the consequences for wrongdoing will never, in the defendant's mind, be severe even when severity is merited." Id.   The Court sided with prosecutors, "You've been very upfront that you feel no sense of shame or guilt," Cooper said. "You suggested antifa was somehow involved. And perhaps most famously, you said that because you had blonde hair and white skin, you wouldn't be going to jail." Id. Ryan's Twitter rants included after her sentence, which clearly shows that defendant has not learned her lesson. "I am not Going to prison for the things that I said, or standing in front of the broken window. Its for walking in Capitol for 2 mins & what the judge says is to serve a deterrence to others since I have a high profile (Which I got after the fact thanks to MSM smear campaign)" November 4, 2021 6:06PM Twitter for iPhone @dotjenna.

Her repentance has been, and continues to be, genuine and sincere. Although she has been contacted for comment from various news outlets for appearances on news programs and documentaries (HBO and CNN), she has been explicit in making no comment. Although the vast majority of the comments and mail she has received has been negative, she has also received "supporter" mail. See Exhibit D[8]. Yet, she has not tried to make excuses for her actions on the internet, to this Court, or even in private. See numerous attached character letters as Exhibit E.

### G.   Need for the Sentence to Reflect the Seriousness of the Offense

As stated above, Ms. Bancroft being subject to a criminal record has been, and will continue be, a severe punishment for this business owner, mother and grandmother. Many have described the actions on January 6th as an attack on democracy; however, Ms. Bancroft's journey to Washington D.C. was simply to attend the former President's speech. Unlike many other defendants in this case, she did not make the decision to walk over to the Capitol Building until it was urged on during the end of the former President's speech. "So we're going to, we're going to walk down Pennsylvania Avenue. I love Pennsylvania Avenue. And we are going to the Capitol, and we're going to try and

---

[8] There was no return address on this correspondence and the United States Postal Service marking is illegible. This exhibit is not being included as an excuse for the defendant but rather to emphasize that there is still belief around our nation to show that some believe that some protestors receive different treatment due to their political beliefs. See also "Arrested Seattle protestors won't be prosecuted, but sent to counseling by group inside CHOP," American News. June 23, 2020. https://thepostmillennial.com/seattle-will-not-prosecute-protestors-for-criminal-acts.

give."www.nrp.org/2021/02/10/966396848/read-trumps-jan-6-speech-a-key-part-of-impeachment-trial (as published by The Associated Press).  This decision truly was a spur of the moment, which she regrets and would avoid if she had the opportunity to relive that day.

### 1.   Selfie Video

As the Court is well aware, after leaving the Capitol and walking toward the train to return to Pennsylvania, Ms. Bancroft made a selfie style video. During said video, she made a disparaging remark aimed at "Nancy," the Speaker of the House.  During the change of hearing held on September 28, 2021, this Court made note of this comment stating it was very "disturbing," "troubling," and describing it one occasion as "pretty outrageous."[9]  The Court even questioned the government as to why this comment did not rise to a threat and why Bancroft was not charged as criminal conduct. Id.  The government correctly stated the video was made when Ms. Bancroft had already left the Capitol, and law enforcement did not take it as an intent to actually do harm to the Speaker of the House despite Ms. Bancroft's words.  Id.

It is important to emphasize two vital facts regarding the video. First, it was made when Ms. Bancroft had already left the Capitol- adrenaline pumping through her system having taken part of a historic event in this country's history.  While the act of entering the Capitol was wrong, the act of protest is one with deep roots in this country's history and fundamentally protected by the First

---

[9] Based on notes taken by defense counsel during the change of plea hearing.

Amendment.  The statement of offense, as drafted by the government, shows that Ms. Bancroft entered and quickly exited the Capitol.  She was not seen walking around, and thus was not looking for anyone.  Who hasn't told their spouse, "I am going to kill you if you leave you leave you shoes on the carpet again!"  And yet these statements are not meant to be taken literally.  Clearly the video was made in jest and bravado.

Second, the video was not meant for publication or mass distribution.[10]  It was not posted on Facebook or any other social media site.  It was not sent to any media or news outlet.  It was not distributed to numerous people.  It was sent to one person, a personal friend of Ms. Bancroft (who then reported it to the FBI, the details of which were then included in the criminal complaint).  Although the Court is correct when it stated (during the change of plea hearing) this friend could have posted it online, Ms. Bancroft's actions should not, and cannot, be judged by what a third party might have done.  In fact, the friend's actions in reporting it is what made it public.  This comment was made privately and akin to being made in someone's home.  Ms. Bancroft's intent is paramount here, and that intent was not to make it public otherwise she would have done so.  Ms. Bancroft's intent is supreme in judging this lapse in her

---

[10] Others have tried to sensationalize this video, i.e. See Sentencing Memorandum of <u>USA v. Cleveland Grover Meredith</u>, 21-cr-159.  "Despite having threatened to kill Speaker Nancy Pelosi while standing on the very steps of the U.S. Capitol, the defendant was never charged with threatening to harm a federal official."  ECF No. 56, Page 23.  This statement is not true and misleading.  First, Bancroft was not on the steps of the Capitol.  Second, the 'threat' was a private message to a friend and not posted on social media or meant for dissemination.  Mr. Meredith was charged with, and pled guilty to, make an actual substantive threat to Speaker Pelosi.

character and overall conduct.   One comment should not becoming overly punitive.

During the change of plea hearing, this Honorable Court also gave an example of road rage incidents, in explaining it as analogous to Ms. Bancroft's comments in her private video.  However, the defense respectfully disagrees.  In a road rage incident, where presumably one person gets out of their car in anger and screams obscenities or threats to another, the attack is made in focused rage and directed straight at the other person- who is in their actual physical presence.  Ms. Bancroft's comments were not made directly to the Speaker, nor was she in the vicinity of the Speaker.  She was not speaking to a group.  Bancroft is seen, and heard, laughing in the video- with not even the slightest hint of anger in her voice and demeanor.  It was not made on a public forum, and the intention was to share it with just one person.

During the change of plea hearing this Honorable Court also stated that the intrigue with these cases is- they essentially turned "otherwise law abiding people into domestic terrorists."  Defense takes issue with this description and the use of the term domestic terrorist, at least in terms of Ms. Bancroft and her specific actions.  Merriam Webster defines terrorist as "an advocate or practioner of terrorism as a means of coercion."   www.merriam-webster.com/dictionary/terrorist.  Terrorism is defined as "the systematic use of terror especially as means of coercion."  Id. at "terrorism."  Nothing in the private

video, or in Ms. Bancroft's actions on January 6th, fall under either of these definitions.

Under 18 U.S.C. § 3661, "no limitation shall be placed on the information concerning the background, character, and conduct of [the defendant] which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."[11]

### 2.   Fine not Necessary

Under the plea agreement agreed to by both the government and Ms. Bancroft, it was greed Ms. Bancroft would pay $500 of restitution toward the total amount owed (in spite of the fact she did not cause any physical damage to the Capitol building).   ECF No. at Page 6.   To impose the maximum fine simply because Ms. Bancroft is in a position to pay it, is overly punitive and is not in line with the goals of sentencing.

### H.   Other Considerations

### 1.   The Presidential Factor

Yet another consideration is that of the former President's call to rally and his actions around the preparation for the rally.   Days after the insurrection, the House impeached Donald Trump for inciting it. www.cbsnews.com/live-updates/trump-impeachment-bipartisan/.   On September

---

[11] This statutory language overrides the advisory policy statements in Part H of the Sentencing Guidelines, which lists as "not ordinarily relevant" to sentencing a variety of factors such as the defendant's age, educational and vocational skills, mental and emotional conditions, drug or alcohol dependence , and lack of guidance as a youth.  See U.S.S.G § 5H1.

29, 2021, the House Committee investigation the January 6th incident at the U.S. Capitol issued additional subpoenas to former Preside Donald Trump allies and several organizers of the rally.   www.nbcnews.com/politics/politics-news/jan-6-comittee-subpoenaws-rally-organizers-trump-allies-n1280384.   The panel leading the investigation sought the subpoenas from various sources including: Katrina Pierson, a former Trump campaign aide who was reported to have a been a liaison between the White Hose and rally organizers; and Maggie Mulvaney, a niece of former top Trump aide Mick Mulvaney who the panel has stated worked directly with rally organizers and communicated with the White House.  Id.[12]  The panel has already subpoenaed and set a date for depositions for former White House strategist Steve Bannon, former White House chief of staff Mark Meadows, former social media director Dan Scavino and Kashyap Patel, chief of staff to former President Trump's defense secretary.

The panel is looking for how the preceding rallies and bus tours were planned and funded for participation.  Id.  In addition, it is looking at the groups' social media activities and communications between law makers and Trumps officials.  Id.  Issuing subpoenas for some of Trump's closest advisers signals an aggressive approach as the requested documents include records related to the Trump administration's plans to discredit the election and dismiss the Electoral College count.  Id.

---

[12] "Rep. Bennie Thompson, D-Miss., the committee's chair, said in a statement that the subpoenas are an effort to collect information from the organizers, in particular, to understand 'how various individuals and entities coordinated their activities leading up to the events of January 6, 2021.'"  Id.

On October 20, 2021, CBS News reported that Brian Murphy, the former Acting U.S. Undersecretary for Homeland Security for Intelligence and Analysis. He stated that those tasked with were "not looking for signs of violence online."  www.yahoo.com/former-trump-official-speaks-january-194201416.html. As a government whistleblower, he told journalist Nicole Sganga he was ordered to alter his intelligence gathering process.  He stated no one was looking for those who were openly talking about violence against the government.  Id.  Ego, even the Capitol Police were ill prepared to stop any insurgency into the Capitol building, though the chatter online was there.  Id.  Had the Capitol Police received this information and had greater numbers of law enforcement to prevent even the public from entering and this incident would never have occurred.  It was reported on December 15, 2021/, Mitch McConnell, the Senate Minority Leader, was closely monitoring what happened with the investigation into January 6th as text messages came out from former White House chief of staff Mark Meadows claiming several Republican leaders had reached out to President Trump before January 6th requesting added security.  www.msn.com/en-us/news/politicsmcconnell-says-january-6-probe-revelations-are-interesting/vi-AARQp4I?ocid=msedgntp.

## 2.  Herd/Mob Mentality

An important consideration in fashioning a sentence in this case is the herd issue.  Herd, or mob, mentality is defined as individuals influenced by a larger group.  www.webmd.com/mental-health/what-is-a-mob-menatality.  A mob

is, in very broad terms, a crowd of people gathered together at a particular time and place, some or many of whom start to engage in destructive and sometimes violent behavior. Id.[13]  Psychology gives several causes in understanding how mob mentality occurs: (1) deindividuation- when people are part of a group, they experience a loss of self-awareness. Davies, Nicola, Health Psychology Consultancy, "The Psychology of Mob Mentality", August 9, 2011.  (2) Identity when people are part of a group, they can lose their sense of individual identity. (3) Emotions—being part of a group can lead to heightened emotional states whether it is excitement, anger, or hostility.  (4) Acceptability—behaviors usually seen as unacceptable become acceptable when others in a group are seen carrying them out. (5) Anonymity—people feel anonymous within a large group, which reduces their sense of responsibility and accountability.  (6) Diffusion of responsibility—being part of a group creates the perception that violent or unacceptable behavior is not a personal responsibility but a group one.  The larger the group or crowd, the more likely there will be deindividuation and diffusion of responsibility. Id.

Understanding and addressing mob-based harms, however, presents a number of difficulties. www.yahoo.com/former-trump-official-speaks-january-194201416.html, supra.  In collectives such as mobs, people can act in ways they would not ordinarily act, and this is a significant fact in thinking about

---

[13] See also Lee C. Bollinger, *The First Amendment's Original Sin.* 72 U. Chi. L. Rev. 417 (2005).

responsibility and punishment for the harms that ensue. Id.  The question of punishment is particularly pressing in the context of contemporary philosophical work on mobs. Id.  However, when it comes to the question of determining punishment for these harms, they still give primacy to *mens rea* as it relates to individual persons, despite clearly recognizing the *mens rea* element is complicated by the collective dimension of mob activity. Id.

In *The Morality of Groups*[14], Larry May and in *Programming collective control*, Kenneth Shockley, respectively,[15] discussed punishment for mob-based harms fall back on the idea of individual mens rea. Sean Bowden, Sarah Sorial & Kylie Bourne.  *Punishment for Mob-based Harms: Expressing and Denouncing Mob* Mentality, Journal of Applied Philosophy.  Volume 38, Issue 3. July 2021; Pp 366-383.  Both May and Shockely recognize the individual mens rea element is complicated by the fact that a person's intentional actions in the context of mob activity have a collective dimension to them, either because they are 'group-based', or because they are enabled or constrained by the collective's 'normative authority'. Id.  Bowden, et al criticize May's suggestion that members of mobs have group-based 'pre-reflective intentions because it fails to reflect this complication as to punishment. Id.  Bowden, et al further state it does not seem plausible that a *pre-reflective* intention can account for the complex collective

---

[14] Larry May, THE MORALITY OF GROUPS: COLLECTIVE RESPONSIBILITY, GROUP-BASED HARM, AND CORPORATE RIGHTS (Notre Dame, IN: University of Notre Dame Press,1987).

[15] Kenneth Shockley, 'Programming collective control', *Journal of Social Philosophy* 38,3 (2007): 442–455.

actions of some of the mobs May considers. Id. The collective actions of the Parisian mob in July 1789 that culminated in the taking of the Bastille, for example, required sophisticated divisions of labor, even if decisions regarding who had to do what and when as part of the joint effort had to be made rapidly, and in the situation of action itself. Id. Moreover, the entire, complex collective action was not transitory, but rather sustained by cooperative effort over a number of days. Id.

A second distinction important to analyze is between shared and collective responsibility. Id. Shared responsibility refers to the responsibility that attaches to *individuals* in virtue of their being constitutive members of the group, and behaving in ways that enables the production of harm. Id. Collective responsibility, on the other hand, is not attributed to individuals but rather to the group entity as such. Id. In this case, the government is proceeding under shared responsibility (thus not charging certain individuals such as this defendant with conspiracy). Yet, there is insufficient attention devoted to the manner in which mob intentions arise. Id. The relation of solidarity between mob members is an indispensable condition for the emergence of mob intentions, the process through which the latter emerge remains mysterious thus explaining why many of the people involved on January 6th say they do not know why they did what they did. Id.

Regarding responsibility, some mobs are 'cohesive' in some sense, it does not help us understand the kind of responsibility that may be attributed to

'non-cohesive' mobs – which is to say, mobs that are collectively implicated in the production of harms despite not being guided by group-based intentions and beliefs. Id. referencing Larry May, SHARING RESPONSIBILITY (Chicago: University of Chicago Press, 1992), pp. 105-114.  The members of a rioting mob, for example, may not cohere around shared purposes such as storming a castle or demonstrating united resistance to a corrupt or oppressive regime.

By exploring the development of patterns of behavior, these processes have the capacity not only to understand mob actions and to begin solution-focused dialogue within communities, but also to contribute to victims' healing, even where the cases of mob harms are historical. Id.  Specific emphasis could be placed on understanding the way that the mob action came about and, where appropriate, was sustained. Id.  Should such forms of punishment be pursued it would be a way to hold mob members to account, who as individuals may not have acted, but who nevertheless contributed to the production of harm. Id.  So although Ms. Bancroft entered, she was not a contributor to the production of harm.

It has been noted the combination of unemployment and scarcity of employment opportunities over outsources jobs and immigrants has also led to financial          survival          for          many          of          the          people          involved. www.psychologytoday.com/us/blog/facing-trauma-together/202101/the-psychology-mob-mentality.

### 3.    COVID-19 Pandemic and Quarantine Effects on Mental Health

Another of the underlying issues with what occurred on January 6, 2020, has been the global outrage over the pandemic over the coronavirus outbreak.  This has led to a public panic over the COVID-19 outbreak.[16]  On January 6th, people were feeling the effects of almost one year of quarantine. (Pennsylvania, the defendant's home state, went into an almost statewide lockdown commencing on Monday, March 16, 2020. www.governor.pa.gov/wp-content/uploads/2020/03/20200319-TWW-COVID-19-business-closure-order.pdf. People were experiencing emotional disturbance, irritability, insomnia, depression, and post-traumatic stress symptoms after quarantine.  Kathirvel N. Post COVID-19 pandemic mental health challenges. *Asian J Psychiatr*. 2020;53:102430. doi:10.1016/j.ajp.2020.102430.   The long term impact included such serious mental health issues as anxiety, anger, depression, post-traumatic stress symptoms, alcohol abuse, and behavioral changes.  Id.  The headlines from around the country all mirror each other: "Mental health needs surge across Iowa universities"[17]; "'It's not a cold':  COVID-19 is causing sickness and mental health issues in Arizona kids"[18]; "Quarantine 'Magnifies' Depression, Mental

---

[16] AF Sigit Rochadi, Nur Amaina Putri, Zaky Arsy Fauzi. *Public panic over COVID-19 Outbreak: Criticism toward panic theory in collective behavior study.* 10 Technium Soc. Sci. J. 544 (2020).  (This article evaluates the issue of pubic panic over the coronavirus outbreak in Indonesia from March to April 2020.)

[17] www.thegazette.com/higher-education/mental-health-needs-surge-across-iowa-universities/

[18] www.azcentral.com/ covid-19-disrupting-school-and-causing-health-problems-az-kids%2F8371055002%2F.

Health Struggles During COVID-19 Crisis Organizations Seeing Surge In Calls, Need For Mental Health Services" Wisconsin)[19]; "The Implications of COVID-19 for Mental Health and Substance Use"[20].  A KFF Health Tracking Poll from July 2020 also found that many adults are reporting specific negative impacts on their mental health and well-being, such as difficulty sleeping (36%) or eating (32%), increases in alcohol consumption or substance use (12%), and worsening chronic conditions (12%), due to worry and stress over the coronavirus. Id.  As the pandemic wears on, ongoing and necessary public health measures expose many people to experiencing situations linked to poor mental health outcomes, such as isolation and job loss. Id.

During the COVID-19 pandemic, concerns about mental health and substance use have grown, including concerns about suicidal ideation. In January 2021, 41% of adults reported symptoms of anxiety and/or depressive disorder (Figure 2), a share that has been largely stable since spring 2020. Id.  In a survey from June 2020, 13% of adults reported new or increased substance use due to coronavirus-related stress, and 11% of adults reported thoughts of suicide in the past 30 days. Id.

The medical community is well aware of these issues, even after vaccine opportunities seem to offer a light at the end of the tunnel and have

---

[19] www.wpr.org/quarantine-magnifies-depression-mental-health-struggles-during-covid-19-crisis

[20] www.kff.org/coronavirus-covid-19/issue-brief/the-implications-of-covid-19-for-mental-health-and-substance-use/.

studied the direct and indirect effects and factors contributing to the decline in people's mental health throughout the COVID-19 pandemic (both during, and after, vaccine administration).  Pandey K, Thurman M, Johnson SD, Acharya A, Johnston M, Klug EA, Olwenyi OA, Rajaiah R, Byrareddy SN. Mental Health Issues During and After COVID-19 Vaccine Era. Brain Res Bull. 2021 Nov;176:161-173.  doi: 10.1016/j.brainresbull.2021.08.012.  Epub 2021 Sep 3. PMID: 34487856; PMCID: PMC8414813.   The medical community even conducted studies of the effects of the pandemic on social media.  Saha K, Torous J, Caine ED, De Choudhury M. Psychosocial Effects of the COVID-19 Pandemic: Large-scale Quasi-Experimental Study on Social Media. J Med Internet Res. 2020 Nov 24;22(11):e22600.  doi: 10.2196/22600.  PMID: 33156805;  PMCID: PMC7690250.

## 4. Social Media's Influence

In fashioning a sentence, this Court should also consider the social media problem present at the time of the January 6th event.  On October 3, 2021, the program "60 Minutes" televised an interview with Facebook whistleblower Frances Haugen, who had anonymously filed complaints with federal law enforcement that Facebook research had shown how profit margins could be increased by hate and misinformation propaganda.   www.msn.com/en-us/news/politics/ex-facebook-manager-alleges-social-network-fed-capitol-riot/ar-

AAP6yef?ocid=msedgntp.[21]   Ms. Haugen, who joined Facebook in 2019, stated that "Facebook, over and over again, has shown it chooses profit over safety."  Id. She further indicated Facebook "prematurely turned off safeguards designed to thwart misinformation and rabble rousing after Joe Biden defeated Donald Trump" in the presidential election last year.  Id.  She alleges this contributed to the January 6th U.S. Capitol raid.  Id.  Because Facebook dissolved a unit on civic integrity after the election, Ms. Haugen specified it was then she realized, "I don't trust that they're willing to actually invest what needs to be invested to keep Facebook from being dangerous."  Id.

This backlash has intensified when last September, The Wall Street Journal's publication of an expose showing how Facebook's own internal research concluded that the social network's "attention-seeking algorithms" helped develop political dissent and had also contributed to mental health and emotional issues among teenagers.  Id.[22]   Haugen filed at least eight (8) complaints with the Securities and Exchange Commission.  Id.

The defense wishes to highlight the aforementioned issues are not presented as excuses for the defendant's actions but rather to help this Court

---

[21] At heart of the matter are algorithms used that Facebook that show up on users' mews feeds showing that the favor hateful content.  Ms. Haugen stated that a change to the content flow in 2018 contributed to more "divisiveness and ill will" within the network.  Id.  Facebook used this information as a pattern to sell more digital ads that generate most of its advertising.  Id.

[22] Facebook CEO Mark Zuckerberg testified before a House Committee in April 2021 regarding Facebook's illicit use of user content by (now defunct) Cambridge Analytica to influence elections in this country.  "Facebook CEO Mark Zuckerberg Testifies Before House Committee" CBS News New York, April 11, 2018.  www.cbsnews.com/newyork/news/facebook-mark-zuckerberg-house-committee-testimony/.  See also Netflix Documentary, "The Great Hack" (2019) (Data, arguably the world's most valuable asset, is being weaponized to wage cultural and political wars. The dark world of data exploitation is uncovered through the unpredictable personal journeys of players on different sides of the explosive Cambridge Analytica/Facebook data story.) www.IMDb.com.

understand these overreaching national issues   which contributed to Ms. Bancroft's actions.  It is the defense's contention but for the culmination of all of these events, Ms. Bancroft would not be before the Court.  Consequently, due to all of these considerations, this Court has discretion to sentence Ms. Bancroft based upon a review of the statutory factors set forth in § 3553(a) to a term of no further penalty.

## IV.        FACTORS THAT MAKES AN IMPRISONMENT SENTENCE UNNECESSARY

### A.        COVID 19 Pandemic Consideration

The initial outbreak of coronavirus disease 2019 (COVID-19), caused by the novel severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2), was first reported in December 2019 in Hubei Province, China. Montoya-Barthelemy AG, Lee CD, Cundiff DR, Smith EB. COVID-19 and the Correctional Environment: The American Prison as a Focal Point for Public Health [published online ahead of print, 2020 Apr 17]. *Am J Prev Med*. 2020;S0749-3797(20)30144-6. doi:10.1016/j.amepre.2020.04.001.  It has since been declared a pandemic by the World Health Organization, with an increasing velocity of deaths and diagnoses in the U.S.  Id.  As of June 4, 2020, COVID-19 has infected 161,513,458 million people worldwide resulting in 3,352,109 deaths.  World Health Organization (WHO), *Coronavirus (COVID-19),* https://covid19.who.int.

Prisoners and correctional staff share an environment known to amplify, accelerate, and act as a reservoir for outbreaks of respiratory disease. American Prison, supra.  As a respiratory-borne illness, the rate of transmission is largely dependent upon the extent of respiratory contact between individuals. Id. The novel coronavirus that causes COVID-19 is highly contagious.  It spreads from person to person through respiratory droplets and close personal contact.  Id. People who are asymptomatic or pre-symptomatic can unknowingly transmit the virus, making it particularly difficult to slow its spread. Id.

Detention settings are extremely susceptible to rapid and disastrous spread of infectious disease, owing to both environmental and host factors—a point extensively documented by the historical spread of influenza, tuberculosis, and other respiratory pathogens. Id. citing Centers for Disease Control ("CDC"). Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities. www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html. Accessed March 29, 2020 and Maruschak LM, Sabol WJ, Potter RH, Reid LC, Cramer EW. Pandemic influenza and jail facilities and populations. Am J Public Health. 2009:99 (suppl 2):S339–S344. doi: 10.2105/ajph.2009.175174.  Crowding, inadequate ventilation, and security issues all contribute to the spread of infectious disease in jails and prisons.    Martin Kaste, *Prisons and Jails Worry About Becoming Coronavirus 'Incubators'*, NPR (Mar. 13, 2020),

https://www.npr.org/2020/03/13/          815002735/prisons-and-jails-worry-about-becoming-coronavirus-incubators.[23]

While vaccines have offered some hope for the future, this pandemic is far from over especially for thousands of federal inmates and detainees who have not yet had the opportunity to be vaccinated.  This is also true for the issue of variants which still cause a large threat to our entire world population. Carl Zimmer: *Scientists warn U.S. lawmakers about the continued threat of coronavirus variants.*   The New   York   Times,   May   12,   2021. https://www.nytimes.com/2021/05/12/science/covid-variant-mutation-tracking.html.  Even for prisoners who have been vaccinated, courts have ordered compassionate release including risk of infection from a variant.  United States v. Michael Deshone Matthews, 2021 WL 3883735, No. 15-CR-118, E.D. Calif., Mueller, C.J., Aug. 31, 2021.  This is especially a viable concern now as the Omicron   variant   beings   to   sweep   the   nation   and   the   world. www.cnn.com/2021/11/25/world/covid-variant-south-africa-immune-evasion-transmissibility/index.html.[24]

---

[23] The number of infected staff and inmates is artificially low; the BOP's official numbers found on the website are drastically underreported.  For example, as of November 9, 2020, the website reported 25 inmates as infected with the virus at the Federal Detention Center in Philadelphia ("FDC"); when a letter from the Department of Justice to Judge Anita Brody with regards to Timothy Brown, et al. v. Warden Keven Pistro, Class Action Case No. 20-cv-1914-AB shows that 80 inmates were infected as of that date. See Doc. No. 125.  Likewise at FCI Cumberland in Maryland, as of November 22, 2020, the website stated only 1 inmate and 3 staff members were infected when in fact the number of infected inmates was 17 (with more test results outstanding).

[24] David McKenzie and Ghazi Balkiz, CNN *A new COVID-19 Variant could show immune evasion and enhanced transmissibility, South African scientists warn.* Fri November 26, 2021.  Professor Tulio de Oliveira, the director of the Center for Epidemic Response and Innovation, said the variant has "many more

**B.      Lack of Danger to Community**

Ms. Bancroft is not a physical danger to the public, as evidence by the absence of any criminal record and the lack of violence in this matter.  Her statement, which could be argued to be a threat of violence was private and never meant to be taken seriously, or make public.  See arguments about the video above.  Imprisonment is therefore not necessary to protect the public from her actions.

**C.      Imprisonment would not serve any purpose to provide the Defendant with any necessary training, education or other correctional treatment as it is not necessary in this case**

Ms. Bancroft is a high school graduate and so she does not need any education that could be sought out while in custody.  Also, she is a business owner in Pennsylvania.  She works full time as a personal trainer and has been employed full time legitimately her entire adult life.  Accordingly, she does not require any vocation training.  18 U.S.C. § 3553(a).  She has not used or abused alcohol or narcotics and so does not require any addiction or rehabilitative programs, or other correctional treatment which may be offered in prison.  Id.

**D. Imprisonment Could be Detrimental to Bancroft's future**

Subjecting Ms. Bancroft to an imprisonment term, however short, could subject to her to drug use and physical abuse she has never had to confront. Messina, N., Burdon, W., Hagopian, G. and Prendergast, M., 2006. Predictors of

---

mutations than we have expected," adding it is "spreading very fast and we expect to see pressure in the health system in the next few days and weeks."

prison-based treatment outcomes: A comparison of men and women participants. *The American journal of drug and alcohol abuse*, *32*(1), pp.7-28. It will also subject to her to other more dangerous offenders which could lead to assaults and abuse that could negatively affect her the rest of her life.  See Ireland, J.L., 1999. Bullying behaviors among male and female prisoners: A study of adult and young offenders. *Aggressive Behavior: Official Journal of the International Society for Research on Aggression*, *25*(3), pp.161-178.  There is also the problem is abuse by prison staff.  Fathi, D.C., 2010. The challenge of prison oversight. *Am. Crim. L. Rev.*, *47*, p.1453.

### E. Imprisonment in this Case Should Not be Politically Motivated

There is perhaps no other time in this Court's tenure it has considered a term of incarceration for a non-violent misdemeanor for a defendant with zero criminal history points.  In fact, this misdemeanor of such a minor magnitude it does not trigger even the lowest end of the sentencing guidelines.  If it were not for the political undercurrent of this case, the defense suggests this Honorable Court would not even consider incarceration as an option. Therefore, any recommendation for incarceration is not in line with the actual actions Ms. Bancroft took part in.  Her video message was not a direct threat, nor was it

public.  Her time inside the building was minimal and no property damage or assault took place while she was inside.[25]

**V.**      **CONCLUSION**

For all the foregoing reasons, we urge this Court to consider Ms. Bancroft's cooperation with law enforcement, her remorse and apologies, the consequences she has already faced and endured as a result of this case and impose only a fine to allow her to continue in the positive path she lived prior to this incident.

Respectfully submitted,

/s/ Carina Laguzzi
CARINA LAGUZZI, ESQ.
Counsel for Defendant Bancroft

DATED: February 28, 2022

---

[25] In the event, the Court is inclined to sentence Ms. Bancroft to a term of imprisonment, the defense requests any period of incarceration be served on home confinement.

## <u>CERTIFICATE OF SERVICE</u>

I, CARINA LAGUZZI, certify that on this 28th day of February, 2022, I have served a copy of the attached Sentencing Memorandum via electronic filing, thus making it available for downloading and printing, upon the following parties:


Sean Murphy
Assistant United States Attorney
Torre Chardón, Suite 1201
350 Carlos Chardón Street
San Juan, PR 00918

The Honorable Emmitt Sullivan
U.S. District Judge
U.S. District Courthouse
333 Constitution Avenue NW
Washington, D.C. 20001


/s/ Carina Laguzzi
CARINA LAGUZZI, ESQUIRE
Attorney for Defendant Bancroft